CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAR - 9 2006

JOHN F. CORCORAN, CLERK
BY: /s/
   DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **BRENDA COULTHARD,** | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 1:04cv00129 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| **JO ANNE B. BARNHART,** | ) By: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** | ) Senior United States District Judge |
| | ) |
| Defendant. | ) |

In this social security case, the court vacates the final decision of the Commissioner denying benefits and remands this case to the Commissioner for further development consistent with this memorandum opinion.

*I. Background and Standard of Review*

Plaintiff, Brenda Coulthard, ("Coulthard"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Coulthard's claim for a period of disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423. (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) (West 2003 & Supp. 2005).

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

Coulthard protectively filed her application for DIB benefits on or about February 28, 2003, alleging disability as of February 12, 2003, based on extrinsic and intrinsic asthma, myasthenia gravis and allergies. (Record, ("R."), at 48-51, 69, 97.) Her application was denied initially and on reconsideration. (R. at 38-40, 43-46.) Coulthard then requested a hearing before an administrative law judge, ("ALJ"). (R. at 47.) The ALJ held a hearing on December 15, 2003, at which Coulthard was represented by counsel. (R. at 25-35.)

By decision dated January 15, 2004, the ALJ denied Coulthard's claim. (R. at 16-22.) The ALJ found that Coulthard met the disability insured status requirements of the Act and was insured for DIB purposes through the date of the decision. (R. at 21.) The ALJ concluded that Coulthard had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 21.) The ALJ found that Coulthard had severe impairments, namely asthma and myasthenia gravis, but he

-2-

Case 1:04-cv-00129-GMW-PMS   Document 22   Filed 03/09/06   Page 2 of 18   Pageid#: 123

found that Coulthard did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21.) The ALJ found that Coulthard's allegations regarding her limitations were not totally credible and that she retained the residual functional capacity to perform light work[1] in a clean, but not sterile environment. (R. at 21.) The ALJ found that Coulthard could perform her past relevant work as a secondary school teacher in a clean but not sterile environment, but not in her former teaching environment. (R. at 21.) Therefore, the ALJ concluded that Coulthard was not under a "disability" as defined in the Act at any time through the date of the decision and was not eligible for benefits. (R. at 21-22.) *See* 20 C.F.R. § 404.1520(f).

After the ALJ issued his opinion, Coulthard pursued her administrative appeals, (R. at 11-12), but the Appeals Council denied her request for review. (R. at 5-8.) Coulthard then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2005). This case is before the court on the Commissioner's motion for summary judgment, filed November 16, 2005, (Docket Item No. 20), and Coulthard's motion for summary judgment, (Docket Item No. 17), filed October 14, 2005.

## II. Facts

Coulthard was born in 1948, which classifies her as an individual of "advanced

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2005).

age" under 20 C.F.R. § 404.1563(e) (2005).[2] (R. at 48.) Coulthard received a Bachelor of Arts degree and has past relevant work experience as a secondary education teacher. (R. at 29, 70, 75.)

Coulthard testified at her December 15, 2003, hearing that she retired from teaching due to disability and was subsequently awarded benefits from the Virginia Retirement System. (R. at 29.) Coulthard testified that she lived with her husband and two children. (R. at 28.) Coulthard stated her date of birth was in 1948, and at the time of the hearing she was 55 years old. (R. at 28.) She testified that she was disabled due to asthma and myasthenia gravis.[3] (R. at 30, 32.) Coulthard stated that she suffered from sporadic asthma attacks when she exerted herself. (R. at 30.) According to Coulthard, at times, her asthma was so intense that it was difficult for her to walk from the bedroom to the kitchen without gasping for air. (R. at 31.) She stated that she had used inhalers, nebulizers and anti-inflammatory medications to treat her asthma. (R. at 31.)

The ALJ next questioned Coulthard about her myasthenia gravis. (R. at 32.) Coulthard testified that her myasthenia gravis caused her left eye to only partially

---

[2]Under 20 C.F.R. § 404.1563(e) (2005), a person is classified as being of "advanced age" when she is 55 years of age or older.

[3]Myasthenia gravis is a disorder of neuromuscular function due to the presence of antibodies to acetylcholine receptors at the neuromuscular junction. Clinical symptoms include fatigue and exhaustion of the muscular system with a tendency to fluctuate in severity and without sensory disturbance or atrophy. The disorder may be restricted to a muscle group or become generalized with severe weakness and, in some cases, ventilatory insufficiency. It may affect any muscle of the body, but especially those of the eyes, face, lips, tongue, throat and neck. See DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1083 (27th ed. 1998).

-4-

open, and she experienced double vision in her left eye. (R. at 32.) The myasthenia gravis also caused Coulthard hand weakness. (R. at 32.) She testified that her myasthenia gravis was exacerbated during episodes of increased asthma attacks. (R. at 32.)

Coulthard testified that she did drive an automobile, but not for great distances. (R. at 32.) In fact, Coulthard testified that she drove only around town and only to familiar places such as to the grocery store and to her children's school. (R. at 32.) Coulthard testified that her hobbies included cooking, and she stated that she was a good cook. (R. at 32.) She also testified that she read books occasionally and went to church twice a week. (R. at 32-33.)

Coulthard stated that mold was an extremely potent allergic trigger for her asthma, and mold was present in the schools where she worked. (R. at 33.) In fact, Coulthard testified that she had to take four allergy shots because she was so allergic to mold. (R. at 33.) She testified that she was especially allergic to Aspergillus mold, which mainly grows in books, magazines and other kinds of material containing cellulose. (R. at 33.) Coulthard testified that her asthma would intensify when she would go back to school every fall, but her asthma was less intense when she could control her environment. (R. at 33-34.) Coulthard testified that other allergic triggers for her asthma included perfumes and cleaners. (R. at 34.) She also testified that when she moved from a cold environment to a hot environment, her asthma problems were exacerbated. (R. at 34.) Finally, Coulthard noted that her asthma problems were much improved due to the fact she was no longer being exposed to the mold that was present at the school where she taught. (R. at 34.)

-5-

In rendering his decision, the ALJ reviewed records from Dr. Michael Fletcher, M.D.; Dr. Neil D. Wallen, M.D.; Dr. Stephen Wayne, M.D.; Johnston Memorial Hospital, ("Johnston Memorial"); Abingdon Ear Nose and Throat Associates, P.C.; Dr. Randolph R. Cole, M.D.; Wellmont Bristol Regional Medical Center; Dr. Laramie Triplett, M.D.; Dr. John G. Byers Jr., M.D., F.C.C.P.; Dr. Richard M. Surrusco, M.D., a state agency physician; and Dr. F. Joseph Duckwall, M.D., a state agency physician.

In a letter dated June 18, 1999, Dr. Neil D. Wallen, M.D., stated that he had treated Coulthard for asthma. (R. at 107.) Dr. Wallen noted that Coulthard's asthma was under good control until the previous fall when she started suffering from increased coughing and breathing difficulties. (R. at 107.) It was Dr. Wallen's opinion that Coulthard's exacerbated asthma symptoms were due to a change in job locations. (R. at 107.) According to Dr. Wallen, not only had Coulthard's symptomatology increased, but she also significantly increased the use of her asthma medications during this time period. (R. at 107.) These increases in Coulthard's symptomatology and medication usage were believed by Dr. Wallen to be caused by allergic triggers in her new work environment. (R. at 107.) Dr. Wallen opined that Coulthard would greatly benefit from a change back to her previous work environment. (R. at 107.)

On September 19, 2002, Coulthard was seen by Dr. Michael Fletcher, M.D. (R. at 116.) She complained of a sore throat, sinus congestion and cough that had been persistent for about four weeks. (R. at 116.) Dr. Fletcher noted that Coulthard experienced labored breathing and was in respiratory distress. (R. at 116.) She was

diagnosed with a cough and wheezing along with a history of allergic rhinitis and reactive airway disease. (R. at 116.)

Coulthard was seen by Dr. Fletcher on September 26, 2002, and she complained of episodic laryngospasm. (R. at 115.) She told Dr. Fletcher that her laryngospasm episodes had increased in frequency, and they had a duration of 10 to 20 seconds. (R. at 115.) Dr. Fletcher noted that Coulthard was a cogent self-observer, and he referred her to an ear, nose and throat specialist, ("ENT"), for further review of her digressive laryngospasm. (R. at 115.)

On October 4, 2002, Coulthard was seen by Dr. Randolph R. Cole, M.D. (R. at 129.) She presented symptoms of congestion, rhinorrhea, eye irritation and ear fullness, which started in late August. (R. at 129.) Dr. Cole noted that Coulthard's symptoms began when she started teaching at a different school. (R. at 129.) Dr. Cole discussed the possibility of Coulthard again changing schools. (R. at 129.) Coulthard was diagnosed with allergic rhinitis, asthma and a history of laryngospasms. (R. at 129.)

Coulthard was treated at Abingdon Ear, Nose and Throat Associates, P.C., on October 10, 2002. (R. at 130-31.) The treating nurse, Shannon Stacy, L.P.N., gave Coulthard an allergy test. (R. at 130-31.) Coulthard's test results revealed that she was allergic to house dust, cockroaches, cats, oak, maples and molds, specifically, Aspergillus mold. (R. at 130-31.) Coulthard was scheduled for a weekly allergy shot. (R. at 130.)

On October 14, 2002, Coulthard again saw Dr. Fletcher with continued complaints of severe fatigue. (R. at 114.) Dr. Fletcher noted that he was concerned with Coulthard's work environment. (R. at 114.) He believed some environmental factor at work was taking a toll on her and her ability to continue working. (R. at 114.) He also noted that her eyes were drooping more, so much so, that he believed a visit to Dr. Stephen L. Wayne, M.D., a neurologist, was in order. (R. at 114.)

Dr. Laramie C. Triplett, M.D., treated Coulthard on October 25, 2002. (R. at 132-34.) Coulthard complained of shortness of breath. (R. at 132.) Dr. Triplett diagnosed Coulthard with allergic rhinitis and a heightened asthma condition due to her work environment. (R. at 133.)

On November 5, 2002, Coulthard was referred to Dr. John G. Byers Jr., M.D., F.C.C.P., by her treating physician, Dr. Fletcher. (R. at 136-38.) Dr. Byers evaluated Coulthard's recent progressive exacerbation of her otherwise previously stable asthma condition. (R. at 136.) He found that Coulthard was positive for cough, shortness of breath, wheezing and production of string sputum with plugs, and she was chronically fatigued. (R. at 136.) Dr. Byers noted that Coulthard was in no acute respiratory distress, although her breath sounds were quite congested with loose bronchitic wheeze on forced expiration. (R. at 137.) He opined that this sounded more like bronchitis than a classic asthma attack. (R. at 138.) Dr. Byers diagnosed Coulthard with a recent exacerbation of asthma of multiple possible causes, chronic otitis and possible chronic sinusitis. (R. at 137.) Dr. Byers recommended further testing to determine whether Coulthard had chronic sinusitis (R. at 138.) On December 18, 2002, Dr. Byers found that Coulthard's FEV1/FVC ratio was reduced

at 67, and she a had mild diffuse obstructive ventilatory process with an element of reversibility consistent with asthma. (R. at 135.) Coulthard was referred to Dr. Stephen L. Wayne, M.D., by her primary care physician, Dr. Fletcher, on November 5, 2002, for a neurologic consultation regarding her myasthenia. (R. at 143-44.) Dr. Wayne noted that Coulthard had an abnormal exam. (R. at 143.) She had subtle left-sided ptosis[4] that worsened with prolonged upward gazing. (R. at 143.) He noted prominent left eye myokymia[5] and that both of Coulthard's eyes were swollen. (R. at 143.) Dr. Wayne diagnosed Coulthard with ocular myasthenia, allergy symptoms that explained the majority of her problems and left arm weakness. (R. at 144.)

Coulthard went to Johnston Memorial Hospital, ("Johnston Memorial"), for a CT scan of her sinuses on November 8, 2002. (R. at 139.) The impression from the CT scan indicated mild mucosal thickening in the maxillary sinuses bilaterally consistent with chronic sinusitis, mucus retention cysts in the maxillary sinuses bilaterally and asthma. (R. at 139.)

Coulthard was seen by Dr. Fletcher on November 11, 2002. (R. at 112.) Her cough was better, but she experienced wheezing with only minimal exertion. (R. at 112.) Coulthard complained about anxiousness, but this was attributed to side effects caused by the medications she was taking. (R. at 112.)

---

[4]Ptosis is a sagging or prolapse of an organ or part, especially a drooping of the upper eyelid. See Dorland's at 1387.

[5]Myokymia is a benign condition marked by brief spontaneous tetanic contractions of motor units or groups of muscle fibers, usually adjacent groups of fibers contracting alternately. See Dorland's at 1091.

-9-

On November 25, 2002, Coulthard was seen by Dr. Cole. (R. at 128.) Coulthard complained of continued nasal congestion and a headache. (R. at 128.) Dr. Cole noted that Coulthard's symptoms improved while she was away from school for a week, and Coulthard had noticed improvement in her condition on the weekends, but the symptoms worsened once she returned to school on Monday. (R. at 128.) Coulthard stated that a mold study had been performed at the high school and Aspergillus mold was found. (R. at 128.) Aspergillus mold is an antigen, which Coulthard had shown sensitivity to on a previous allergy test. (R. at 128.) Dr. Cole diagnosed Coulthard with allergic rhinitis exacerbated by mold exposure in the workplace. (R. at 128.) Dr. Cole further recommended that Coulthard discuss workplace reassignment. (R. at 128.)

Coulthard was seen at the Wellmont Bristol Regional Medical Center on December 1, 2002. (R. at 145.) She presented with shortness of breath, wheezing and coughing. (R. at 145.) The attending physician diagnosed Coulthard with an acute exacerbation of asthma and recommended that she not work the following day. (R. at 145-46.)

On January 31, 2003, Coulthard was again seen by Dr. Fletcher. (R. at 111.) She presented with an acute flare-up of her upper airway congestion with a definite flare-up of wheezing. (R. at 111.) Coulthard believed that this flare-up was caused by her exposure to an unknown cleaning solution at work the previous day. (R. at 111.) Dr. Fletcher noted that she was struggling significantly with her work environment, and he prescribed Dexamethasone, Prednisone and Qvar. (R. at 111.)

Coulthard presented to Dr. Fletcher on February 12, 2003, with significant wheezing, audible from across the room, and breathiness in her conversation. (R. at 110.) Dr. Fletcher noted that, again, she had worsened allergic symptoms due to the time of day. (R. at 110.) Apparently, her worsened allergic symptoms were revealed by the fact that her myasthenia gravis had caused more eyelid droop, and this was attributed to the fact that her appointment was later in the day, thereby implicating that she had longer exposure to the allergen triggers at work. (R. at 110.) Examination revealed diffuse inspiratory and expiratory high-pitched sounds in Coulthard's lungs and fair to poor air movement. (R. at 110.) Dr. Fletcher determined that Coulthard had tachycardia at 108 beats per minute without obvious gallop or murmur in the upright position. (R. at 110.) It was then determined by Dr. Fletcher that Coulthard should take a month's leave of absence from work because the work environment to which she was exposed had greatly increased her asthma to a severe degree. (R. at 110.) She was prescribed an extended course of steroids. (R. at 110.)

Dr. Fletcher filled out a Physician's Report for the Virginia Retirement System on February 20, 2003, regarding Coulthard's condition and its effect on her ability to work. (R. at 126-27.) In describing Coulthard's disorder, Dr. Fletcher stated that she suffered from repeated episodes of asthma, which cleared up when she was away from her place of employment. (R. at 126.) Because of the asthma attacks, Dr. Fletcher had increased the use of steroids for aggressive rescue care. (R. at 126.) Coulthard had a drop in her pulmonary dynamics, which was persistent despite good treatment. (R. at 126.) Dr. Fletcher noted that Coulthard was restricted because when she developed respiratory distress, she had to remove herself from the inciting

environment immediately. (R. at 126.) Dr. Fletcher further noted that Coulthard also suffered from severe fatigue because of her myasthenia gravis. (R. at 126.) Dr. Fletcher diagnosed Coulthard with the disabling conditions of severe extrinsic/intrinsic asthma and myasthenia gravis. (R. at 126.) These findings were substantiated, according to Dr. Fletcher, by prior work-ups by Dr. Wallen on Coulthard's allergies, asthma and immunology and by Dr. Wayne who treated Coulthard's myasthenia gravis. (R. at 127.) Dr. Fletcher determined that Coulthard could not perform her present job due to her inability to withstand the environment. (R. at 127.)

On February 27, 2003, Coulthard was seen by Dr. Fletcher. (R. at 109.) He noted that she had not been working for the previous two weeks and that her asthma had improved significantly, which he attributed to her absence from work. (R. at 109.) Dr. Fletcher also noted that Coulthard's fatigue from her myasthenia gravis had improved, and she was able to walk and exercise due to the abatement of her asthma symptoms. (R. at 109.) Coulthard was ordered to slowly progress with exercise in the hope that she might lose the 30 pounds of weight gain, which was caused by her frequent need for Prednisone that had been previously prescribed to alleviate her asthma. (R. at 109.)

Dr. Fletcher gave Coulthard an excused absence from work from February 12, 2003, until March 12, 2003, and he later noted that she needed another excused absence until her next appointment on March 31, 2003. (R. at 109.) Coulthard was examined by Dr. Fletcher on March 31, 2003. (R. at 108.) Dr. Fletcher noted that Coulthard's asthma had continued to improve the longer she was away from her place

of employment. (R. at 108.) In fact, Coulthard reported to Dr. Fletcher that since leaving work, her sleep was not interrupted by a persistent cough, and Dr. Fletcher opined that she was able to start exercising. (R. at 108.) Dr. Fletcher also noted that Coulthard's myasthenia gravis showed improvement. (R. at 108.) There was no change in Coulthard's asthma medication regimen, and she was scheduled for a later follow-up appointment. (R. at 108.)

Dr. Richard M. Surrusco, M.D., state agency physician, completed a Residual Physical Functional Capacity Assessment of Coulthard on May 6, 2003. (R. at 153-60.) Dr. Surrusco determined that Coulthard could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for a total of six hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday and push and/or pull for an unlimited duration. (R. at 154.) Dr. Surrusco found that Coulthard could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 155.) He further determined that Coulthard's allegations regarding her asthma were only partially credible. (R. at 155.) Dr. Surrusco found that Coulthard should avoid all exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 158.)

Coulthard presented intrinsic and extrinsic asthma symptoms to Dr. Fletcher on July 29, 2003. (R. at 172.) A physical examination revealed forced expiratory wheezes. (R. at 172.) It was noted in the record that she had to use her inhaler four to five times a day when she experienced an exacerbation in her asthma condition. (R. at 172.)

On September 22, 2003, Coulthard was treated by Dr. Fletcher. (R. at 171.) Dr. Fletcher noted that her asthma was doing much better. (R. at 171.) He attributed Coulthard's improvement to an increased control of her environment. (R. at 171.) Dr. Fletcher noted that her asthma was under good control clinically, and he advised her to continue her then-current regimen. (R. at 170.)

Coulthard was treated by Dr. Fletcher on November 10, 2003. (R. at 169.) She complained of a cough with sputum. (R. at 169.) After a physical examination was performed, Coulthard was diagnosed with acute sinusitis and stable asthma. (R. at 169.)

Dr. Fletcher filled out a disability services asthma questionnaire on November 11, 2003. (R. at 161-64.) In the questionnaire, he found that Coulthard had asthma attacks in spite of prescribed treatment that required physician intervention once every two months or at least six times a year. (R. at 161.) Dr. Fletcher found that Coulthard's asthma impairment met the listing level of severity when her environment stimulated her asthma attacks. (R. at 162.) He characterized her symptoms as shortness of breath, chest tightness, coughing, rhonchi, fatigue, wheezing, episodic acute asthma attacks and problems with myasthenia gravis. (R. at 162.) Dr. Fletcher pointed to Coulthard's allergies as the precipitating factors that triggered her asthma attacks. (R. at 162.) He further characterized her condition as moderately severe. (R. at 162.) Dr. Fletcher noted that Coulthard suffered asthma attacks two to three times per week when in an adverse environment that lasted three to five days. (R. at 163.) Dr. Fletcher opined that Coulthard needed two or more days to recover from an asthma attack; therefore, he further opined that Coulthard's asthma attacks would

interfere with her ability to maintain a reliable attendance schedule in a work atmosphere. (R. at 163.)

On December 5, 2003, Dr. Fletcher filled out a disability services Rest[6] Questionnaire. (R. at 165.) In the questionnaire, Dr. Fletcher found that, based upon his diagnosis, Coulthard would need rest periods with varying duration depending on the severity of her extrinsic and intrinsic asthmatic condition at the time. (R. at 165.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the

---

[6]"Rest" is defined as: Freedom of activity or labor; to cease from action or motion; refrain from labor or exertion; to be free from anxiety or disturbance; to sit or lie fixed or supported. *See* WESTER'S NINTH NEW COLLEGIATE DICTIONARY, (1984).

-15-

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

> Under Social Security Ruling 82-62,
>
>> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit. . . .
>>
>> Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations.

*See* S.S.R. 82-62, WEST'S SOCIAL SECURITY REPORTING SERVICE (West 1983); *See also Woody v. Barnhart*, 326 F. Supp. 2d 744, 750 (W.D.Va. 2004).

The ALJ found that Coulthard could return to "past relevant work as a teacher in a clean, but not sterile environment, which is a normal environment in the national economy." (R. at 21.) However, in the same finding of fact the ALJ also stated that Coulthard could not return to her former teaching environment. (R. at 21.) The underlying reason as to why Coulthard could not return to her past teaching

-16-

environment is that her asthma was severely exacerbated by this environment. However, the ALJ says she can return to work as a teacher in a clean, but not sterile environment, which is, apparently, a normal teaching environment in the national economy, according to the ALJ. Under this rubric, one is left to believe that Coulthard's former teaching environment was not a normal teaching environment. I question how the ALJ knows what constitutes a normal teaching environment in the national economy. The ALJ did not state how he came to his finding as to what constitutes a normal teaching environment. It is not apparent from the ALJ's opinion if he consulted the Dictionary of Occupational Titles or any other source of information as required by 20 C.F.R. § 404.1560(b)(2) when he reached his residual functional capacity conclusion at step four of the sequential evaluation process regarding what constitutes a normal teaching environment. The ALJ did not meet the "adequate documentation" requirement of S.S.R. 82-62 when he determined the environmental factors that make up a normal teaching environment. There is a gap in the ALJ's evidence which must be accounted for by him on remand. While the ALJ may be correct in his assertion as to what constitutes a normal teaching environment, he must show the foundation for this assertion. Even Dr. Surrusco, the state agency physician, determined that Coulthard should avoid all exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 158.) The ALJ must provide evidence that demonstrates that a "normal teaching environment" would not expose Coulthard to the environmental triggers that severely aggravate her asthma. As the United States Court of Appeals for the Fourth Circuit said in *Wilson,* 617 F.2d at 1054, "it is manifestly unfair for the ALJ to rely on assumptions and 'facts' which the claimant cannot, without reading the ALJ's mind, test or rebut." Therefore, the ALJ's decision at step four of the sequential evaluation is not supported by substantial evidence in the record.

## IV. Conclusion

Based on the above, the plaintiff's motion for summary judgment will be overruled and defendant's motion for summary judgment will be overruled. The Comissioner's decision denying benefits will be vacated, and plaintiff's claim for benefits will be remanded to the Commissioner for further consideration in accordance with this memorandum opinion.

An appropriate order will be entered.

DATED: This 8th day of March, 2006.

_____
SENIOR UNITED STATES DISTRICT JUDGE